UNITED STATES DISTRICT COURT        FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

KEITH BARKLEY, CHAKKA BAPTISTE,
DAVID BOATWRIGHT, TROY
BREWSTER, and SHARENE DOUGLAS,

                    Plaintiffs,             MEMORANDUM
                                     AND ORDER
    - versus -                   12-CV-2159

THE CITY OF NEW YORK, DEPARTMENT
OF TRANSPORTATION, COMMISSIONER
JANETTE SADIK-KHAN, JIMMY
ANDERSON, and LINDA W.
WASHINGTON,

                    Defendants.

APPEARANCES:

        CRONIN & BYCZEK, LLP
                1983 Marcus Avenue, Suite C-120
                Lake Success, New York 11042
        By:    Moshe C. Bobker
                *Attorneys for Plaintiff*

        MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
                100 Church Street
                New York, NY 10007
        By:    John S. Schowengerdt
                *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

        Plaintiffs, all Assistant City Highway Repairers working for the New York City

Department of Transportation ("DOT"), bring this action against the City of New York ("the

City"), the DOT, and two DOT employees, Jimmy Anderson (a supervisor) and Linda

Washington (a personnel department employee).[1]  Plaintiffs assert claims of racial discrimination in employment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 1981 and 1983, the Fourteenth Amendment, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Plaintiffs allege they were not given the same opportunity for promotion within DOT to the position of Highway Repairer as was Christian LaCroix, who is white.  Plaintiffs further claim that defendants denied them overtime and training, subjected them to a hostile work environment, and took retaliatory actions against them.  For the reasons set forth below, defendants' motion for summary judgment is granted on all claims.

BACKGROUND

A.  *Factual Background*

The following facts are taken from the parties' Local Rule 56.1 statements, affidavits, deposition excerpts, and other documentary evidence submitted by the parties.  The facts set forth below are either not in dispute or – to the extent they are disputed – are the plaintiffs' version, and I construe all facts in the light most favorable to them.

1.  *Keith Barkley*

Barkley began working at DOT on April 18, 1995 as a City Parking Meter Service Worker.  Pl. Response Rule 56.1 Statement ¶ 1.  He became an Assistant City Highway Repairer ("ACHR") in March 2008 and was assigned to DOT's Flatlands facility in Brooklyn. Schowengerdt Decl. Ex. B, at 16:11-13, 19:3-8 (Barkley Dep.).  For the first five years, the position of ACHR is seasonal employment; an employee with the title of ACHR will work from

---

[1]       Plaintiffs originally also brought claims against Janette Sadik-Khan, the Commissioner of DOT, in her personal capacity.  *See* Am Compl. ¶ 19.  Sadik-Khan was voluntarily dismissed from this action and all claims against her were dropped pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) on November 5, 2012.  *See* Stipulation of Voluntary Dismissal, ECF No. 15.

March through December and is then laid off with the possibility of being rehired the following March. *Id.* at 17:2-11. After five years of seasonal employment, an ACHR becomes a permanent year-round employee but retains the title of ACHR. Pl. Response Rule 56.1 Statement ¶ 4. Barkley became a year-round ACHR in March 2013. *Id.* at ¶ 5.

After Barkley had worked for about three months at the Flatlands facility, James Anderson became his field supervisor. Schowengerdt Decl. Ex. B, at 19:9-20, 20:5-21:1 (Barkley Dep.). Anderson was a Supervisor Highway Repairer, and Barkley worked with him every day while assigned to Flatlands. *Id.* at 21:2-6. Anderson, who is white, started harassing Barkley, who is African-American, in August 2008. *Id.* at 21:21-25. Barkley testified that Anderson used derogatory language and profanity, but did not use any racially derogatory language. *Id.* at 37:17-22, 40:7-10. According to Barkley, Anderson would "yell and scream" and on two occasions he instructed Barkley to do "unnecessary tasks that normally the machines do" and told two other employees to stop working to watch Barkley work. *Id.* at 41:7-11. Barkley stated that the yelling occurred every day and that two or three times Anderson got very close to his face, screaming "[if] you got something to say about me or to me, say it to my face." *Id.* at 42:3-16. Anderson often screamed at Barkley calling him "a stiff," meaning that he was a "lazy worker." *Id.* at 42:22-23. Barkley stated that Anderson would call him a stiff "[w]henever he got a chance," including in front of other employees. *Id.* at 42:24-25. Barkley witnessed Anderson yell at two other African-American co-workers at Flatlands, and once heard Anderson call one of those men "the N word." *Id.* at 43:16-17.

In October 2008, Barkley requested a transfer to a different facility because of Anderson's harassment. *Id.* at 21:10-20. However, after being laid off in December of that year, Barkley was again assigned to Flatlands when he was rehired in March 2009. Pl. Response Rule

56.1 Statement ¶ 11.  Barkley testified that in early 2009, Anderson "got in my face in a hostile manner and it was very intense.  It seemed like he wanted to fight me[,] so I reported him to his supervisor."  Bobker Decl. Ex. B, at 38:4-9 (Barkley Dep.).  Anderson's supervisor told Barkley that he had a conversation with Anderson about the incident.  *Id.* at 39:3-20.

In or around June 2009, Barkley put in another request for a transfer, which was granted, and Barkley was transferred to the 58th Street Depot (the "Depot").[2]  Barkley requested to be transferred in order "to get away from James Anderson."  *Id.* at 24:6-8.  Barkley also believed that at the Depot he would be assigned to drive tractor trailers, which paid $27 per day more than his work at Flatlands.  *Id.* at 24:16-25:15.  Once at the Depot, however, Barkley's new supervisor, Louis Diseo, did not permanently assign Barkley to drive tractor trailers.  *Id.* at 54:21-25.  Instead Diseo, who is white, permanently assigned other white employees, who were less senior and less experienced than Barkley, to drive tractor trailers and Barkley was assigned to drive only occasionally.  *Id.* at 54:20-55:8.  Barkley contends that Diseo discriminated against him and did not assign him to permanently drive a trailer because of his race.  *Id.*

Despite being transferred from Flatlands, Barkley occasionally still interacted with Anderson when making deliveries to sites Anderson supervised.  *Id.* at 48:3-7.  At some point early in his time at the Depot, Barkley was assigned to deliver asphalt to a site Anderson was supervising.  *Id.* at 48:12-20.  At the end of Barkley's shift, Anderson called Diseo and told him that Barkley should not be allowed to work overtime because he had not delivered enough loads to the site.  *Id.*  Barkley stated that the reason he had not delivered as many loads as other drivers in that shift is that Anderson purposely placed him in the back of the line of trucks.  *Id.* at 49:10-22.  As a result of Anderson's call to Diseo, Diseo yelled at Barkley when he returned to the Depot and Barkley was not able to work as much overtime that day.  *Id.* at 49:3-6, 49:23-25.

---

[2]  This location is also called the Brooklyn Army Terminal.  Pl. Response Rule 56.1 Statement ¶ 18.

4

In June 2010, Barkley was transferred to the Harper Street Yard,[3] a DOT facility in Queens.  Pl. Response Rule 56.1 Statement ¶ 27.  Harper Street Yard is directly adjacent to an asphalt production facility formally known as the Grace Asphalt Plant.  *Id.* ¶ 28.  The City acquired the Grace Asphalt Plant on March 31, 2010, and renamed it the Harper Street Asphalt Plant.  *Id.* ¶ 29.  Harper Street Asphalt Plant and Harper Street Yard are physically connected, but remain separate DOT facilities.  *Id.* ¶ 30.  DOT employees working as drivers assigned to Harper Street Yard will pick up asphalt from Harper Street Asphalt Plant but are not assigned to work at the asphalt plant itself.  *Id.*  It is disputed whether Barkley was assigned as a driver to Harper Street Yard or Harper Street Asphalt Plant, *see id.* ¶ 31, so (for reasons that will become obvious in a moment) I assume he was assigned to Harper Street Asphalt Plant itself.

Barkley filed a charge of discrimination against the DOT with the Equal Employment Opportunity Commission ("EEOC") on January 4, 2011.  Schowendgerdt Decl. Ex. F (Barkley EEOC Charge); Pl. Response Rule 56.1 Statement ¶ 41.  In the charge, Barkley alleged that DOT discriminated against him based on his race.  Schowendgerdt Decl. Ex. F (Barkley EEOC Charge).  Specifically, Barkley claimed that the City hired Christian LaCroix, who is white, as an ACHR at the Harper Street Asphalt Plant[4] in violation of the Collective Bargaining Agreement between the Union and the City.  *Id.*  Barkley complained that the position was not posted, that LaCroix was "hired at a rate of pay which exceeds the entry level rate of pay for an ACHR," that he was trained on various equipment while being paid overtime, and that he was subsequently promoted to the position of Highway Repairer, in further violation of the Collective Bargaining Agreement.  *Id.*  According to Barkley, despite being notified of

---

[3]      The Harper Street Yard is also known as the Queens Depot.  Pl. Response Rule 56.1 Statement ¶ 27.

[4]      The facility is referred to in the charge as the "Grace Asphalt Plant."  *See* Schowendgerdt Decl. Ex. F (Barkley EEOC Charge).

these events, the Union did not take any action.  *Id.*  Barkley's charge asserted that the Union had failed to represent his interests, and that these events had caused him "tremendous personal anxiety, health concerns, personal and professional embarrassment . . . [and] economic, physical, emotional, and mental damages."  *Id.*

Plaintiffs Chakka Baptiste, David Boatwright and Troy Brewster filed identical charges on the same day that Barkley filed his.  Am. Compl. ¶ 6; Pl. Response Rule 56.1 Statement ¶¶ 41-42, 69-70, 104-05.  Plaintiff Sharene Douglas filed an identical charge six days later.  Pl. Response Rule 56.1 Statement ¶¶ 121-22.

Barkley testified in his deposition that he believes Linda Washington discriminated against him on the basis of his race by denying him opportunities for promotion. Schowendgerdt Decl. Ex. B, at 58:3-21 (Barkley Dep.).  Washington, who is African-American, is an Administrative Manager in the Personnel Unit of the Roadway Repair Maintenance division of DOT.  Pl. Response Rule 56.1 Statement ¶ 32.  Her duties in this position include coordinating the intake of applicants to DOT as well as the intake of existing employees seeking promotions or new positions within DOT.  *Id.* ¶ 35.  She posts positions, gathers application materials, and reviews applicants' qualifications.  Bobker Decl. Ex. C, at 26:4-8 (Washington Dep.).  These materials are forwarded to other staff members within the Personnel Department who make the final decision of whether to hire or promote an applicant.  Pl. Response Rule 56.1 Statement ¶ 36.  Her position also includes coordinating interviews, which consists of scheduling them, reviewing the questions that the interviewing managers plan to ask, and sitting in on the interviews and taking notes.  Bobker Decl. Ex. C, at 27:7-28:10 (Washington Dep.).  Washington does not have the authority to make final decisions regarding whether an employee will be promoted from ACHR to Highway Repairer.  Pl. Response Rule 56.1 Statement ¶ 37.

Barkley testified that Washington discriminated against him based on his race by hiring LaCroix.  Bobker Decl. Ex. C, at 60:23-61:5 (Washington Dep.).  Barkley explained that Washington had told him when he first began working at DOT that the only way to be promoted to a Highway Repairer is to work for five years as a seasonal ACHR and then three years as a permanent ACHR (the "5+3 route").  *Id.* at 61:15-21.  Barkley considers LaCroix's hiring and subsequent promotion to Highway Repairer, which did not conform to this schedule, an instance of race-based discrimination against him perpetrated by Washington.

### 2. *Chakka Baptiste*

Baptiste started working at DOT as a seasonal ACHR on April 9, 2007.  Pl. Response Rule 56.1 Statement ¶ 43.  Baptiste was originally assigned to a DOT facility known as "the Dugout," which was located in Manhattan, but in 2008 was transferred to the Harper Street Yard.  *Id.* ¶¶ 44-45.  Baptiste, who is African-American, testified that soon after he was assigned to Harper Street Yard he heard that the facility was known as the "slave yard." Schowendgerdt Decl. Ex. G, at 78:11-12 (Baptiste Dep.).  He understood that DOT employees referred to Harper Street Yard as the "slave yard" because "[i]f you are a minority they will work you as a slave."  *Id.* at 78:20-22.  Baptiste stated that the Harper Street Yard was "commonly known as" the "slave yard" among both white and African-American employees.  *Id.* at 78:17-79:5.  According to Baptiste, on numerous occasions he "worked a four-man detail by [him]self . . . while the other white DOT employees assigned to work that detail . . . slept."  Bobker Decl. Ex. R ¶ 3 (Baptiste Decl.).  Baptiste made an internal complaint to DOT's Office of Equal Opportunity ("OEO") regarding the work environment at Harper Street Yard sometime prior to June 2009.  Pl. Response Rule 56.1 Statement ¶ 62.

On his request, in or around June 2009, Baptiste was transferred to Flatlands.  Pl.
Response Rule 56.1 Statement ¶ 47.  Baptiste testified that at Flatlands he encountered similar
problems to those at Harper Street Yard.  Bobker Decl. Ex. G, at 21:13-15 (Baptiste Dep.).  He
stated that "[t]reatment was different between the blacks and the whites as far as overtime,
location [reporting] . . . and respect."  *Id.* at 21:17-19.  According to Baptiste, overtime went
mostly to white employees, and he believed he was assigned to work less overtime than other
employees.  *Id.* at 22:4-23.  He also testified that location reporting, which is the privilege of not
being required to return to the yard after a shift in the field, was "[m]ostly given to the white
gentlemen," *id.* at 23:11-12, and that African-American employees were often given undesirable
details such as sweeping or shoveling.  *Id.* at 24:4-8.

While assigned to Flatlands, Baptiste was occasionally supervised by Anderson
for a total of three months during the 2011 season.  Pl. Response Rule 56.1 Statement ¶ 43.
Baptiste testified that Anderson would often scream and yell in people's faces.  Bobker Decl. Ex.
G, at 29:14-21 (Baptiste Dep.).  Anderson also once threw a plastic traffic barrel at Baptiste, but
Baptiste dodged it and was not hit.  *Id.* at 32:23-25.  Baptiste stated that although Anderson
yelled at employees of all backgrounds, he especially picked on "Black and Spanish" employees.
*Id.* at 30:9-12.  According to Baptiste, when Anderson yelled at white employees he was "joking
with them" and they would "be laughing and everything afterwards" but that with African-
American employees he was "being very nasty."  *Id.* at 30:22-31:2.  Baptiste never heard
Anderson use any racial slurs, *id.* at 31:3-5, but stated that he saw and personally experienced
Anderson target African-Americans by yelling at them in public in order to embarrass and
demean them.  *Id.* at 33:22-34:24.

On or around November 22, 2011, Baptiste called the OEO regarding a complaint against one of his supervisors at Flatlands, Jimmy Guerero.  Pl. Response Rule 56.1 Statement ¶ 64.  Baptiste told the OEO that Guerero was requiring him to wear a helmet in compliance with a new DOT policy, and that he was having difficulties wearing the helmet because he suffered from Post-Traumatic Stress Disorder.  *Id.*  Baptiste submitted a request for a reasonable accommodation for this issue on February 29, 2012, which was granted on March 19, 2012.  *Id.* ¶ 65.  Shortly before the start of the 2012 ACHR season in March, Baptiste also made a complaint to the OEO regarding Guerero being "very disrespectful, very nasty."  Bobker Decl. Ex. G, at 25:1-18 (Baptiste Dep.).  Baptiste was transferred, in accordance with his accommodation request, in March 2012 to a DOT facility at 10 Pitt Street in Manhattan, known as the Williamsburg Bridge facility.  Pl. Response Rule 56.1 Statement ¶ 66.

During his time at DOT, Baptiste unsuccessfully applied for several positions within the department.  Baptiste applied for the position of Gasoline Roller Engineer in 2010.  Pl. Response Rule 56.1 Statement ¶ 43.  He was interviewed for the position, but he was not selected for appointment.  *Id.*  According to Baptiste, Washington was present at the interview. Bobker Decl. Ex. G, at 42:2-11 (Baptiste Dep.).  In 2011, Baptiste applied for the positions of Tractor Operator and Backhoe Operator, but he was not selected for an interview for either position.  *Id.* at 43:11-16.  He testified that Washington was involved in each of these applications.  *Id.* at 43:7-8.  Baptiste believes that Washington prevented him from being appointed to these positions in retaliation for the complaints that Baptiste had made to the OEO. Response Rule 56.1 Statement ¶ 59.  Baptiste stated he believes that Washington knew about the two complaints, but admitted he had no factual basis for that belief.  Bobker Decl. Ex. G, at 44:20-45:25 (Baptiste Dep.); *see id.* at 45:1-6 (Q: "But if you went to OEO after you talked to

Ms. Washington, how do you know that she knows that you went to OEO?" A: "She knows."  Q: "How do you know that?"  A: "I don't but –."); *id.* at 46:1-3 ("Q: But do you know whether or not [Washington] did [know], that's my question?" A: "No.").  Baptiste believed Washington had discriminated against him because he was initially told that he was qualified for the positions he had applied for but later was told by Washington that he was not qualified.  *Id.* at 47:12-17.  He testified that he saw white employees being hired and trained for the jobs that he had applied for and been rejected from.  *Id.* at 48:3-21.  According to Baptiste, when he confronted Washington with documentation that he was qualified for the positions he had applied for, she told him it was not her who was preventing him from qualifying, but that it was Mark Nova, the head of the engineers.  *Id.* at 46:13-23.  Baptiste asked Nova, who said it was Washington that was preventing Baptiste from qualifying.  *Id.* at 46:22-23.

### 3.  *David Boatwright*

Boatwright started working at DOT in May 2008 as a seasonal ACHR.  Pl. Response Rule 56.1 Statement ¶ 71.  He became a year-round ACHR in March 2013.  *Id.* ¶ 72. In his time working for DOT, Boatwright has always been assigned to the 58th Street facility as a tractor-trailer or dump truck driver.  *Id.* ¶¶ 73-75.  Diseo has always been Boatwright's supervisor at 58th Street.  *Id.* ¶ 76.  However, Anderson has been Boatwright's direct supervisor numerous times between 2009 to present, serving as a safety supervisor or a head supervisor on sites Boatwright has been assigned to.  Bobker Decl. Ex. X, ¶ 4 (Boatwright Decl.).  One day in the summer of 2009, Anderson was the supervisor at the facility where Boatwright was assigned to drop dump truck loads.  Bobker Decl. Ex. F, at 23:22-24:25 (Boatwright Dep.).  Boatwright testified that Anderson was "acting hostile, going crazy, was having a bad day" and when Boatwright was next in line to back his truck up Anderson walked over to Boatwright's truck,

looked at him, and said "Back the fucking truck up, nigger." *Id.* at 23:25-24:6.  Boatwright

believed that if he complained about the incident to another supervisor he would lose his job, so

he did not make a complaint.  *Id.* at 24:9-11.  After this incident, Boatwright has sought to avoid

any contact with Anderson and has had no further interaction with him.  *Id.* at 25:1-8.

        Boatwright testified that he has never had a problem with other DOT employees

to the level of the incident with Anderson, *id.* at 34:1-3, but that he has heard coworkers make

"racial remarks," *id.* at 34:9, including using the word "nigger," but not directed at him.  *Id.* at

35:17-20.  He stated that the use of the term "Mo" for African-Americans by the Italian-

American DOT employees is widespread.  *Id.* at 35:1-6.  According to Boatwright, DOT

employees will often call him to rush a load of asphalt to a site, but then go to lunch without

informing him, which means he will have to wait 45 minutes for them and not be able to eat

lunch himself.  *Id.* at 34:9-34.  Boatwright testified that he was aware that DOT had an internal

office that handles complaints regarding discrimination, but that he never made a complaint

because he was "scared for his job."  *Id.* at 40:15-23; Pl. Response Rule 56.1 Statement ¶ 83.

        Boatwright has never applied for any other position or a promotion at DOT, Pl.

Response Rule 56.1 Statement ¶ 82, and stated in his deposition that he has no personal

complaint against Washington.  Bobker Decl. Ex. F, at 25:15-18 (Boatwright Dep.) ("Q: What

does Linda Washington have to do with your case?  A: Linda Washington, really nothing about

Linda Washington.").  Boatwright stated that Washington was named as a defendant because

"she hired Mr. LaCroix, so to me that's like a slap in the face because I didn't get the same

opportunity as Mr. LaCroix, a position that wasn't posted, and the money, the rate . . . ."  *Id.* at

25:21-24.

Boatwright believes he was not offered the same opportunity as LaCroix because he is African-American and also because he was not employed at the asphalt plant when the City purchased it. *Id.* at 43:8-12. He testified that white DOT employees were also not offered the same opportunity as LaCroix. *Id.* at 43:13-17. Boatwright stated that he does not have the qualifications to apply for the title of Highway Repairer. *Id.* at 77:11-13.

### 4. *Troy Brewster*

Brewster began working at DOT in March 2007 as a seasonal ACHR, Pl. Response Rule 56.1 Statement ¶ 91, and became a year-round ACHR in 2012. *Id.* ¶ 92. Brewster has been assigned to the 58th Street facility since he began working at DOT and has never requested a transfer. *Id.* ¶¶ 93-94. Brewster has never been assigned to the Harper Street Asphalt Plant, but has picked up asphalt and taken trucks to and from that facility. Schowengerdt Decl. Ex. L, at 21:7-15 (Brewster Dep.). Brewster has never applied for a promotion or a different position at DOT. *Id.*, at 33:19-23. He has never made an internal complaint of discrimination with DOT's OEO office. *Id.* at 42:21-43:13.

Brewster testified that he has been directly supervised by Anderson in the field for a week at a time, two to three times per year since he started working as an ACHR. *Id.* at 24:12-25:1, 26:9-17. Brewster stated that he "ha[s] a conflict" with Anderson, *id.* at 25:6-7, and that Anderson screamed and yelled at him approximately six or seven times during the first three years Brewster worked at DOT. *Id.* at 26:1-7, 28:23-29:2. He has never heard Anderson use any racial slurs. *Id.* at 29:19-21.

### 5. *Sharene Douglas*

Sharene Douglas began working at DOT on March 12, 2008, as a seasonal ACHR, Pl. Response Rule 56.1 Statement ¶ 106, and became a year-round ACHR in December

12

2012.  Bobker Decl. Ex. E, at 22:11-15 (Douglas Dep.).  When Douglas was first hired, she was assigned to the Flatlands facility.  Pl. Response Rule 56.1 Statement ¶ 108.  She was supervised at Flatlands by Anderson for approximately a year and a half.  Bobker Decl. Ex. E, at 45:3-6 (Douglas Dep.).  Douglas testified that Anderson "is an out-of-control person . . . .  He likes to yell and scream to where spit is hitting you in the face."  *Id.* at 43:15-17.  On one occasion, likely in 2009, Anderson grabbed a rake out of Douglas's hand in a manner that gave her a splinter, while he was "yelling and carrying on like a madman" and calling Douglas an "idiot."  *Id.* at 44:1-13.  Another time, in either 2008 or 2009, he yelled in Douglas's face because he felt she was not backing up trucks fast enough.  *Id.* at 44:18-45:2.  Douglas testified that Anderson had not done anything that offended her besides those two instances, *id.* at 46:6-9, but is "always yelling and in your face."  *Id.* at 44:16-17.  Douglas has heard Anderson use "the 'N' word" twice and was told about one other instance by a coworker but did not personally hear it.  *Id.* at 45:20-46:1.  Anderson has never used racial slurs towards Douglas, but has called her "an idiot" and said she was "stupid."  *Id.* at 46:2-5.

Douglas testified that in her time at Flatlands, both white and African-American employees referred to the facility as the "slave yard."  Pl. Response Rule 56.1 Statement ¶ 114. She believes Flatlands had this nickname because of the way African-American employees are treated at the facility.  *Id.*  Douglas requested a transfer from Flatlands three or four times per year because of the way African-American employees were treated there.  Bobker Decl. Ex. E, at 76:6-17 (Douglas Dep.).  Douglas believes her transfer requests were not granted primarily because she was a good worker and her supervisors did not want to lose her, *id.* at 78:20-25, but she also noted that white employees often had their transfer requests granted quickly.  *Id.* at 86:18-87:2.

Douglas was transferred to the 58th Street facility at the beginning of the 2012 season.  Pl. Response Rule 56.1 Statement ¶ 117.  She had no problems with her coworkers there, Bobker Decl. Ex. E, at 59:22-60:2 (Douglas Dep.), but she had conflicts when she came into contact with certain former coworkers from Flatlands.  *Id.* at 34:22-35:1.  Because of these conflicts, Douglas requested a transfer to a DOT facility in Kew Gardens, Queens, known as the "Kew Loop" in June 2012, which was granted.  Pl. Response Rule 56.1 Statement ¶ 119.

### 6. *Christian LaCroix*

LaCroix testified that he began working at the privately owned Metropolitan Asphalt Plant ("Metropolitan") in 1988, at the age of 18.[5]  Schowengerdt Decl. Ex. D, at 18:7-14 (LaCroix Dep.).  He was trained at Metropolitan for approximately six months to take on the position of "mixer man."  *Id.* at 19:2-25.  As a mixer man, LaCroix was responsible for the production of asphalt using a "batch plant," which is a machine that makes asphalt.  *Id.* at 43:6-23.  His responsibilities also included maintaining the batch plant equipment and operating a loader and a crane, *id.* at 21:5-9, although he never obtained a license as a crane or loader operator.  *Id.* at 21:17-24.  In 1991, LaCroix started working at the Grace Asphalt Plant, which was owned by Grace Asphalt Company.  Pl. Response Rule 56.1 Statement ¶ 126.  He continued to work at the Grace Asphalt Plant as a mixer man, with the same duties and responsibilities as he had at Metropolitan.  Schowengerdt Decl. Ex. D, at 28:2-14 (LaCroix Dep.).

In April 2010, LaCroix learned that the City was planning to buy Grace Asphalt Plant and he submitted his resume to DOT.  Pl. Response Rule 56.1 Statement ¶ 129.  LaCroix testified that he was called in for an interview at DOT headquarters, where he met with a DOT

---

[5]      Plaintiffs allege there are "critical and obvious discrepancies" contained within LaCroix's resume and between his resume and his deposition testimony, and that this evidence, therefore, "cannot be credited."  Pl. Response Rule 56.1 Statement ¶ 123.  To a large extent, I find that such discrepancies do not exist.  To the extent that inconsistencies do exist, they are extremely minor in nature and relate to LaCroix's high school education, which is not a material issue of fact in this action.

14

employee, Alice Cortez, who asked him questions about his position at the Grace Plant and had him fill out some paperwork.  Schowengerdt Decl. Ex. D, at 36:20-37:19 (LaCroix Dep.). LaCroix went to DOT headquarters a total of four or five times in the process of getting hired by DOT, and one time he met with Washington.  *Id.* at 38:4-12.  LaCroix does not remember what types of questions Washington asked him, but testified that he does not think she asked about his previous work experience at the Grace Plant.  *Id.* at 39:13-17.  LaCroix stated he thinks it was a one-on-one meeting and that she had him fill out more paperwork.  *Id.* at 39:5-17.

As mentioned earlier, when the City bought the Grace Asphalt Plant in 2010, it renamed the facility Harper Street Asphalt Plant but retained the same machinery and technology.  Pl. Response Rule 56.1 Statement ¶ 133.  Once the City acquired the plant, DOT needed to hire an individual to perform the functions of a mixer man for the plant to continue operations.  *Id.* ¶ 134.  The manufacturing facilities at Harper Street Asphalt Plant are comprised of machinery from approximately five different companies, and LaCroix testified that over the years he worked for Grace he received extensive training regarding how to operate these various components of the plant.  Schowengerdt Decl. Ex. D, at 50:17-51:10 (LaCroix Dep.).  He stated that because he had been the mixer man since the asphalt plant was opened by Grace, he has unique training and knowledge of how the plant operates.  *Id.* at 52:6-25.  LaCroix was making $55 per hour before the City bought Grace Asphalt Plant.  *Id.* at 60:7-9.

LaCroix was hired by DOT on April 26, 2010, in the position of ACHR at a starting salary of $24.00 per hour, which amounts to $50,258 annually.  Hochstadt Decl. ¶¶ 19-20.  LaCroix obtained a Commercial Driver's License (CDL) in May 2010[6] and was promoted to the title of Highway Repairer on May 11, 2010, at a salary of $82,392 annually.  Pl. Response

---

[6]      An individual appointed as an ACHR is not required to possess a CDL at the time of appointment, but has 90 days from appointment in which to obtain one.  Pl. Response Rule 56.1 Statement ¶ 141. A Highway Repairer is required to possess a CDL at the time of appointment.  Hochstadt Decl. ¶ 17.

Rule 56.1 Statement ¶¶ 141, 145.  DOT employees at other DOT facilities who perform similar functions as the mixer man at Harper Street Asphalt Plant are employed in the title of Highway Repairer.  *Id.* ¶ 138.

The parties dispute the amount of training LaCroix received from DOT after he was hired as well as the actual role he serves at the Harper Street Asphalt Plant.  Defendants claim, based on LaCroix's own testimony, that after LaCroix was hired by DOT he did not receive any additional training regarding the performance of his duties at Harper Street Asphalt Plant except for obtaining his CDL.  Defendant's 56.1 Statement ¶ 143; Schowengerdt Decl. Ex. D, at 62:2-16 (LaCroix Dep.).  Defendants also assert, based on LaCroix's testimony and the sworn declaration of Marlene Hochstadt, the Deputy Commissioner of Human Resources and Facilities Management at DOT, that LaCroix was hired to perform, and does actually perform, the duties of a mixer man at the Harper Asphalt Plant.  Schowengerdt Decl. Ex. D, at 28:9-14 (LaCroix Dep.) ("Q: Is it fair to say you've been -- A: A mixer man for twenty something years? Yes.  Q: With pretty much the same duties and responsibilities?  A: Yes."); Hochstadt Decl. ¶ 15 ("After interviewing Mr. LaCroix and considering his qualifications, DOT determined that Mr. LaCroix was qualified to be the 'mixer man' at the Plant due to his nineteen years of experience working at the Plant and his specialized knowledge and skills with respect to operating the Plant's asphalt production equipment.").

Plaintiffs, on the other hand, maintain that LaCroix received training from DOT after he was hired and performs the tasks of a "weigh master" at Harper Asphalt Plant.  Bobker Decl. Ex. B, at 101:9-11 (Barkley Dep.) ("And that's all [LaCroix] does is he's actually considered a weigh master.  That's what he's called."); *id.* at 101:20-25 ("I was [at Harper Asphalt Plant] getting loaded . . . it was a delay in the . . . process, and I asked what was going on

16

and they said they were doing training and they were training Christian LaCroix training him for

what he does."); Bobker Decl. Ex. E, at 72:2-7 (Douglas Dep.) ("Q: Do you know what

[LaCroix] does at Harper Street Asphalt?  A: What I've seen him do, they call that a

weighmaster, where they dump the asphalt in the trucks.  Q: Do you know if he does anything

else?  No, not that I know of.  But I think I've seen him on the payloader before."); Bobker Decl.

Ex. X ¶ 5 (Boatwright Decl.) ("I have seen Christian LaCroix work at the Harper Street location

on approximately three to four occasions.  On each occasion I have seen Mr. LaCroix function

only as "weigh master" which means weighing incoming trucks to the yard on the scale, loading

the trucks with asphalt, and then weighing the truck again on the same scale.").

B. *Procedural History*

   All plaintiffs except Douglas filed identical EEOC charges on January 4, 2011;

Douglas filed an identical EEOC charge on January 10, 2011.  Pl. Response Rule 56.1 Statement

¶¶ 41-42, 69-70, 104-05, 121-22; *see also* Am. Compl. ¶ 6.  On January 27, 2012, the

Department of Justice issued "Right to Sue" letters to the plaintiffs. Am. Compl. ¶ 10.  Plaintiffs

commenced this action on May 1, 2012.  *See* Compl., ECF No. 1.  Defendants moved for

summary judgment on all claims August 7, 2013.  I heard oral argument on November 22, 2013.

DISCUSSION

A. *The Summary Judgment Standard of Review*

   A party is entitled to summary judgment upon a showing "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A fact is "material" if its resolution "might affect the outcome of the suit under

the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining

whether material facts are in dispute, all ambiguities are resolved and all inferences are drawn in

favor of the non-moving party. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Adams v. Dep't of Juvenile Justice of City of New York*, 143 F.3d 61, 65 (2d Cir. 1998). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Because "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer*, 156 F.3d at 400, the non-moving party cannot survive a properly supported motion for summary judgment by resting on the pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).

B. *The Title VII Claims*

Plaintiffs allege claims under Title VII for a hostile work environment, denial of overtime, denial of training, retaliation, and failure to promote.

1. *The Timeliness Requirement*

As an initial matter, defendants allege that all of plaintiffs' Title VII claims, except the claim that the promotion of LaCroix was discriminatory, are time-barred. In states that have a fair employment agency, such as New York, plaintiffs may only assert claims under Title VII alleging discrete discriminatory acts that have occurred within 300 days of filing a

18

Charge of Discrimination with the EEOC.  42 U.S.C. § 20003-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002); *Butts v. City of New York Dep't of Housing Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (superceded on other grounds).  In *Morgan*, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  536 U.S. at 114.  The Court explained that hostile work environment claims, on the other hand, "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct."  *Morgan*, 536 U.S. at 115.  Accordingly, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [300 day] time period."  *Morgan*, 536 U.S. at 122.

 As noted above, all plaintiffs except Douglas filed their EEOC charges on January 4, 2011, and Douglas filed her charge six days later on January 10, 2011.  Using the earlier date, defendants correctly note that any alleged discrete discriminatory acts that occurred before March 10, 2010, are time-barred and must be dismissed.  Defendants further argue that plaintiffs have not alleged any acts contributing to a hostile work environment that occurred within that time period and that were committed in furtherance of a policy or practice of discrimination.

 Turning first to the hostile work environment claims, viewing the facts in the light most favorable to the plaintiffs, I conclude for purposes of this motion that plaintiffs have alleged acts that may have contributed to a hostile work environment during the 300-day period prior to filing the EEOC charges.[7]  Accordingly, these claims were timely filed.

---

[7]  Barkley complained of Anderson harassing him when he was assigned to 58th Street Depot. Bobker Decl. Ex. B, at 48:12-20 (Barkley Dep.).  No date for this incident was established in the record, other than that it occurred between June 2009, when Barkley was transferred to the 58th Street facility, and June 2010, when he was transferred to Harper Street.  *Id.*  Taking all reasonable inferences for the non-moving party, I assume, for the purposes of this motion, that this alleged harassment occurred sometime between March 2010 and June 2010, during the 300-day window before the EEOC charges were filed.  Baptiste was working at Harper Street Yard during the 300 days preceding the filing of the EEOC charges and testified that minorities were "worked as slaves" at that

In regards to plaintiffs' other Title VII claims, the allegations regarding LaCroix's promotion is clearly not time-barred.  Plaintiffs implicitly concede, however, that many of their other allegations of discrimination and retaliation set forth in their complaint would be time-barred if viewed individually, but contend that they meet the "continuing violation" exception to Title VII's 300-day filing requirement.  The continuing violation doctrine applies where "discriminatory acts [are] committed under an ongoing policy of discrimination." *Annis v. Cnty. of Westchester,* 136 F.3d 239, 246 (2d Cir.1998) (internal quotation and alteration omitted).  "Under [this doctrine], if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (quoting *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir.1993)).  This doctrine is "disfavored" in the Second Circuit and only applies in "the most compelling circumstances." *Petrosky v. N.Y. State Dep't of Motor Vehicles,* 72 F. Supp. 2d 39, 48 (N.D.N.Y.1999) (internal quotation and citations omitted); *see also Askew v. New York*, 09-cv-553, 2013 WL 450165 at *6 (N.D.N.Y. Feb. 6, 2013).

For the continuing violation doctrine to apply, the initial charge filed with the EEOC must clearly allege a continuing violation.  *See Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985) ("[Plaintiff] did not assert in his EEOC complaint as the basis of his action a continuing violation . . . .  There was therefore no reason for the EEOC to investigate a continuing violation running beyond that date."); *Oteri-Harkins v. City of New York*, 97-cv-2309,

---

facility.  Bobker Decl. Ex. G, at 78:21-22 (Baptiste Dep.).  Brewster testified that he was supervised and harassed by Anderson several times over the first three years he worked at DOT, a period which includes March 2010.  Bobker Decl. Ex. D, at 25:11-12 (Brewster Dep.).  Boatwright testified that he has heard DOT employees use derogatory racial slurs from the time he started with DOT to the present date. Bobker Decl. Ex. F, at 34:9, 35:1-6 (Boatwright Dep.).  Douglas testified that she requested transfers from Flatlands facility, including during the time period covered by the EEOC charge, because of the way African-American employees were treated.  Bobker Decl. Ex. E, at 76:6-17 (Douglas Dep.).

1998 WL 817689 at *4 (E.D.N.Y. Feb. 5, 1998) ("Defendants correctly assert that in order to properly invoke the continuing violation exception, a plaintiff must clearly assert the continuing violation in both the EEOC charge and in the complaint.") (internal quotation omitted); *Carrasco v. New York City Off-Track Betting Corp.*, 858 F. Supp. 28, 31-32 (S.D.N.Y. 1994) (For continuing violation exception to apply, "[p]laintiff must clearly assert the continuing violation in both the EEOC charge and in the complaint.").

The identical EEOC charges filed by the plaintiffs as the basis of this action did not state that the alleged discriminatory hiring and promotion of LaCroix was part of a continuing violation. *See* Schowengerdt Decl. Ex. F (Barkley EEOC Charge), Ex. I (Baptiste EEOC Charge), Ex. K (Boatwright EEOC Charge), Ex. M (Brewster EEOC Charge), Ex. N (Douglas EEOC Charge). These charges detail plaintiffs' complaints regarding the allegedly discriminatory hiring and promotion of LaCroix, but make no reference to any other instances of discrimination suffered by the plaintiffs. The only statement contained in the charges that could possibly be construed as notice of a continuing violation is the second sentence, which states "I charge the above-named respondents with discrimination based upon their unlawful intentional pattern and practice of race discrimination and retaliation." *See*, *e.g.*, Schowengerdt Decl. Ex. F (Barkley EEOC Charge). In light of the single discriminatory act alleged in the charge, I conclude that this vague and conclusory statement is insufficient in itself to constitute a clear allegation of a continuing violation. *See Carrasco*, 858 F. Supp. at 31-32 (holding that where the EEOC charge only alleged one discrete act of discrimination, "the fact that the 'Continuing Action' box was checked on [plaintiff's] EEOC charge" was insufficient to satisfy requirement of clearly stating a continuing violation).

The claims plaintiffs raise under Title VII for denial of overtime, failure to train,[8] and retaliation are based on alleged incidents that did not take place during the 300-day period preceding the filing of their EEOC charges.  Accordingly, defendants' motion for summary judgment is granted on this basis for all of plaintiffs' Title VII claims except for their hostile work environment claim and the claim that LaCroix's promotion was discriminatory.

    2.   *The Exhaustion Requirement*

The requirement that plaintiffs exhaust all administrative remedies by filing a charge with the EEOC is "an essential element of title VII's statutory scheme." *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) (quoting *Butts,* 990 F.2d at 1401).  "If a claimant has failed to pursue a given claim in administrative proceedings, the federal court generally lacks jurisdiction to adjudicate that claim." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001).  Defendants allege that summary judgment is warranted on all of plaintiffs' Title VII claims except the allegations regarding the hiring and promotion of LaCroix because plaintiffs failed to exhaust their administrative remedies on those claims by not including them in their respective EEOC charges.

---

[8]     The charges filed with the EEOC do describe the training that plaintiffs claim LaCroix received from DOT after he was hired, and that he was paid overtime for this training.  Schowengerdt Decl. Ex. F ("[T]he Employer, with the acquiescence of the Union trained Mr. LaCroix on the 'pay loader' and 'back hoe' while paying him overtime to perform job functions as an  'operating engineer' in anticipation of a further illegal promotion, in violation of Civil Service Law and the Collective Bargaining Agreement.").  However, the charges allege this training and overtime as essentially a benefit of the allegedly discriminatory promotion of LaCroix, and do not appear to allege separate claims for failure to train and failure to provide overtime *to the plaintiffs*.  The charges claim that LaCroix should not have received the promotion and the training and overtime that allegedly came with the promotion.  They do not allege that plaintiffs were entitled to similar training or overtime absent a promotion.  I conclude, therefore, that this language is more fairly construed as part of the claim that LaCroix's promotion was discriminatory, rather than a separate charge for failure to train or denial of overtime to the plaintiffs.  In any case, even if the failure to train and denial of overtime claims were timely raised and administrative remedies exhausted, plaintiffs' would not be able to establish a prima facie case on these claims because they are unable to adduce evidence that similarly situated employees received training or overtime that plaintiffs were denied.  *See Partridge v. HIP of Greater New York*, 97-cv-0453, 2000 WL 827299 at *3 (S.D.N.Y. June 26, 2000) ("A discrimination plaintiff and other employees are similarly situated if they are employed in a position of comparable responsibility and duties . . . .").  Because LaCroix had nineteen years' experience in the production of asphalt and was qualified to serve as the mixer man at Harper Street Asphalt Plant, he is not situated similarly to the plaintiffs.  *See Henry v. Daytop Village, Inc.*, 42 F.3d 89, 97 (2d Cir. 1994); *see also Partridge*, 2000 WL 827299 at *3.

As discussed above, plaintiffs' EEOC charges focused exclusively on the allegedly discriminatory hiring, training, and promoting of LaCroix.  Allegations regarding failure to train, denial of overtime, and hostile work environment are absent from the EEOC charges.  *See* Schowengerdt Decl. Ex. F (Barkley EEOC Charge), Ex. I (Baptiste EEOC Charge), Ex. K (Boatwright EEOC Charge), Ex. M (Brewster EEOC Charge), Ex. N (Douglas EEOC Charge).  Apart from the conclusory statement, previously cited above, charging defendants "with discrimination based upon their unlawful intentional pattern and practice of race discrimination and retaliation," the only mention of retaliation in the EEOC charges appears under the heading "Circumstances of Alleged Discrimination," where a box marked "Retaliation" is checked along with a box marked "Race."  Schowengerdt Decl. Ex. F (Barkley EEOC Charge).

Even if a given claim is not included in an EEOC charge, a district court may still exercise jurisdiction over it so long as it is "reasonably related" to the claims the plaintiff did pursue before the EEOC.  *Fitzgerald*, 251 F.3d at 359.

> Subsequent conduct is reasonably related to conduct in an EEOC charge if: [1] the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; [2] it alleges retaliation for filing the EEOC charge; or [3] the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."

*Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts*, 990 F.2d at 1402-03); *see also Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003).

The claims asserted in the plaintiffs' complaint but absent from their EEOC charges do not fall into any of these three categories.  As detailed above, the only factual allegation contained in the EEOC charges is that DOT hired and promoted Christian LaCroix in a discriminatory fashion.  *See* Schowengerdt Decl. Ex. F (Barkley EEOC Charge).  "In

determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'"  *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (quoting *Freeman v. Oakland Unifed Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)).

As to the first category, plaintiffs' claims of retaliation, deprivation of overtime, and a hostile work environment would not fall within the reasonably expected scope of an EEOC investigation of DOT's hiring and promoting LaCroix.  A reasonable investigation by the EEOC based on the plaintiffs' EEOC charges would focus on whether DOT's specific decision to hire and promote LaCroix to the position of Highway Repairer was discriminatory in nature, not on the workplace conditions or alleged deprivation of overtime and training experienced by the plaintiffs, which were not mentioned in the EEOC charges.  *See, e.g.*, *Wright v. New York City Off-Track Betting Corp.*, 05-cv-9790, 2008 WL 762196 at *3 (S.D.N.Y. Mar. 24, 2008) ("Generally, presenting a disparate treatment or retaliation claim to the EEOC will not exhaust a hostile work environment claim."); *cf.Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (noting that if EEOC charge alleges race discrimination, but not national origin discrimination, these two types of alleged discrimination will often present identical factual issues and thus may constitute reasonably related conduct that would fall within a reasonable EEOC investigation).

Because plaintiffs did not sufficiently allege retaliation for filing an EEOC charge, the second exception is also inapplicable.  *See Alfano v. Costello,* 294 F.3d 365, 382 (2d Cir. 2002) (finding plaintiff's "vague, conclusory accusations of 'retaliatory conduct' . . . insufficient to meet the . . . requirement of a specific linkage between filing an EEOC charge and an act of retaliation"); *Daigle v. West,* 225 F. Supp. 2d 236, 242 n.13 (N.D.N.Y. 2002) ("For [the

second] exception to apply . . . the plaintiff must allege specific linkage between the filing of an EEO charge and the acts of retaliation about which he complains.").

Turning to the third category, it is clear that plaintiffs' claims alleged for the first time in this court were not carried out in "precisely the same manner" as the claim regarding promoting LaCroix alleged in the EEOC charges.  Claims under this exception are considered reasonably related because while the agency would not have the opportunity to investigate the exact discriminatory incident, it would be able to investigate the same "method of discrimination."  *See Butts*, 990 F.2d at 1403; *Boateng v. Apple Health Care, Inc.*, 156 F. Supp. 2d 247, 252 (D. Conn. 2001).  The "method of discrimination" alleged in plaintiffs' EEOC charges, namely that LaCroix was hired and promoted in discriminatory manner, is not the same method of discrimination as plaintiffs' other Title VII claims raised in this court.

Due to plaintiffs' failure to exhaust their administrative remedies, defendants' motion for summary judgment is granted on all of plaintiffs' Title VII claims on this additional ground, except for the claims regarding the discriminatory promotion of LaCroix.

### 3. *The Remaining Title VII Discrimination Claim on the Merits*

Plaintiffs' only Title VII claim that was both timely filed and exhausted is the alleged failure to promote.  Plaintiffs allege that DOT's appointment of LaCroix to the position of Highway Repairer constituted race-based discrimination because he had not first worked for five years as a seasonal ACHR and three years as a full-time ACHR (the "5+3 route"), which plaintiffs maintain is the only possible experience that would serve to qualify an individual to be appointed a Highway Repairer.  Plaintiffs allege that racial discrimination motivated defendants' decision to promote LaCroix to this position and exclude them from consideration.

Defendants, on the other hand, maintain that the 5+3 route is just one of three different ways a candidate can be considered qualified to be appointed a Highway Repairer. Defendants rely on the "Qualification Requirements" section of the Highway Repairer title published by the New York City Department of Citywide Administrative Services, Code No. 92406, which lists the required qualifications as:

> (1) Three years of full-time experience as an Assistant City Highway Repairer; or
> (2) Three years of full-time experience acquired within the last 5 years in roadway maintenance and repair using asphalt and concrete mixes, performing the functions of a Highway Repairer; or
> (3) Education and/or experience equivalent to "1" or "2" above.

Hochstadt Decl. Ex. A (Highway Repairer Job Description); *see also* Hochstadt Decl. ¶ 11. Based on this title description, defendants argue that LaCroix, who worked for nineteen years at what is now the Harper Street Asphalt Plant, clearly meets the third experience level that would qualify him to be appointed a Highway Repairer. *See* Schowengerdt Decl. Ex. D, at 28:9-11; Hochstadt Decl. Ex. B (LaCroix Resume); Hochstadt Decl. ¶ 8 ("Mr. LaCroix, who was already successfully performing the job and had been employed at the Plant for nineteen years, was an ideal candidate for this position.").

### a.   *The* McDonnell Douglas *Burden-Shifting Framework*

Plaintiffs offer no direct evidence of racial animus in the process of LaCroix's promotion. In the absence of direct evidence of discrimination, the determination of a summary judgment motion in an employment discrimination case is made pursuant to the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the burden of persuasion "remains at all times with the plaintiff," *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, (1981); however, the burden of production shifts as follows:

> First, the plaintiff has the burden of proving by [a] preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802) (citation omitted).

        b.   *The Prima Facie Case*

To establish a prima facie case of discrimination based on a failure to promote, a plaintiff must show that: (1) she was a member of a protected class; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) she "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253; *see also Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998).

Plaintiffs here are all African-American, and thus they are members of a protected class.  Determining whether plaintiffs have met the second requirement – that plaintiffs applied and were qualified for the position sought – is less straightforward.  It is undisputed that none of the plaintiffs applied to be promoted to the position LaCroix was appointed to, that is, Highway Repairer serving as the mixer man at the Harper Street Asphalt Plant.  However, plaintiffs allege they did not apply for this position because the opening was not publicly posted and they had never been informed that the equivalent of three years' experience as a full-time ACHR was considered by DOT as an alternative qualification for that position.  Both the Supreme Court and the Second Circuit have recognized that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802

n.13; *Brown*, 163 F.3d at 709-10.  In *Brown*, the Second Circuit noted that some cases will present facts in which "an allegation of a specific application [is] a quixotic requirement."  163 F.3d at 710.  The court in *Brown* held that the facts in that case did not warrant relaxing the application requirement because at least some of the positions at issue had been posted.  *Id.*  Here, in contrast, LaCroix's position was not posted.  *See* Bobker Decl. Ex. B, at 102:5:9.  I conclude that this case presents facts in which the requirement to have actually applied for the promotion at issue would be "quixotic," and need not be met to establish a prima facie case.

The latter part of the second requirement, that plaintiffs must show they were qualified for the position sought, presents a greater obstacle to plaintiffs' attempt to establish a prima facie case.  Only Baptiste has provided evidence that he might have been qualified to be promoted to a Highway Repairer position because he has experience or education equivalent to three years of full-time employment as an ACHR.[9]  However, none of the plaintiffs, including Baptiste, have adduced any evidence that they were qualified for the specific position for which LaCroix was hired, serving as the "mixer man" for the Harper Street Asphalt Plant.  *See* Hochstadt Decl. ¶¶ 7-8.  Even if Baptiste might have been qualified for promotion to Highway Repairer, he testified he had no experience working in the production of asphalt.  Bobker Decl. Ex. G, at 58:24-25 ("Q: Have you done any work in asphalt production?  A: Asphalt production, no, not asphalt production, no.").  LaCroix, in contrast, had worked for nineteen years as the mixer man on the asphalt production equipment still in use at the plant today.  Schowengerdt Decl. Ex. D, at 28:9-11; Pl. Response Rule 56.1 Statement ¶ 133.  I find, therefore, that plaintiffs

---

[9]    Baptiste testified that he has many years of experience in the United States Army and Air Force operating heavy machinery, assisting in road repair, and working as a mechanic.  Bobker Decl. Ex. G, at 58:8-25.  He stated "Everything we do [at DOT] is the same thing I [did] with the Army and also the Air Force.  *Id.* at 58:17-18.  None of the other plaintiffs present any evidence that they possessed experience equivalent to three years of full-time employment as an ACHR.

have not shown that they were qualified for the position sought and thus have failed to establish a prima facie case of discriminatory failure to promote.

Even assuming that plaintiffs succeeded in establishing a prima facie case of discrimination, they are unable to carry their burden on the third step of the *McDonnell Douglas* framework.  LaCroix's unique position of having nineteen years of experience running the specific asphalt production equipment in use at Harper Street Asphalt Plant constitutes a legitimate, nondiscriminatory reason why plaintiffs were not promoted in his place.  There is not sufficient evidence in the record from which a rational jury could find that this stated reason for promoting LaCroix was pretextual.  *See Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 426 (E.D.N.Y. 2012).  Accordingly, defendants' motion for summary judgment on this claim is granted.

C.  *The Remaining Claims*

Claims for race-based employment discrimination brought under 42 U.S.C. § 1981 are examined under the same framework as Title VII claims.  *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).  Summary judgment on plaintiffs' § 1981 claims is therefore granted for the same reasons discussed above.

Section 1983 provides a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII."  *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004).  Accordingly, to the extent that plaintiffs' claims under § 1983 seek to

vindicate their rights provided under Title VII, defendants' motion for summary judgment is granted on that basis.  To the extent that plaintiffs' allege § 1983 violations distinct from their claims under Title VII, they have only supported such claims with conclusory allegations and defendants' motion for summary judgment is granted on these claims as well.

Defendants' motion for summary judgment on plaintiffs' claims under New York State and New York City law is granted for the same reasons discussed above.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted on all claims.  The Clerk of the Court is respectfully requested to enter judgment accordingly and close the case.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 2, 2014
       Brooklyn, New York

30